UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

V.                                          NO. 11-48

HENRY M. MOUTON                             SECTION "F"

ORDER AND REASONS

Before the Court is Henry Mouton's Motion for Order for Production of Discovery and for Continuance of Sentencing. For the reasons that follow, the motion is GRANTED in part and DENIED in part, without prejudice.

**Background**

This unique white-collar criminal case presents a troublesome issue concerning a defendant's post-plea right to inquire into investigatory findings regarding prosecutorial misconduct.

Approximately four years ago, after Jefferson Parish awarded a contract to River Birch, Inc. (a local landfill) under questioned circumstances, the U.S. Government began investigating whether the landfill's owners obtained the contract illegally through payoffs. As a part of the larger probe into alleged white-collar criminal misconduct by River Birch, on February 25, 2011, the United States indicted the defendant, Henry M. Mouton, a former Commissioner for the Louisiana Department of Wildlife and Fisheries. In an extensive eight-count indictment filed on February 25, 2011 Mr.

1

Mouton was charged with one count of conspiracy to receive illegal payoffs by an agent of a program receiving federal funds, in violation of 18 U.S.C. § 371; three counts of receipt of illegal payoffs by an agent of a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B); and four counts of making false statements to federal agents, in violation of 18 U.S.C. § 1001(a)(2). The 44-page indictment charges that, from about April 14, 2003 to April 16, 2010, including during Mr. Mouton's tenure as Commissioner on the Louisiana Wildlife and Fisheries Commission, Mr. Mouton was involved in a conspiracy to accept bribes as a public official: "Co-conspirator A" and other co-conspirators paid Mouton $463,000.00 in illegal payoffs to influence and reward him for his official action, in particular, his efforts to keep the Old Gentilly Landfill closed to benefit the rival landfill.

About three months later, on June 1, 2011, Mr. Mouton pled guilty to Count 1 of the indictment (conspiracy to receive illegal payoffs), pursuant to a plea agreement with the Government; specifically, Mr. Mouton admitted, under oath, that over a seven-year period he accepted hundreds of thousands of dollars in illegal bribes from unnamed "Co-conspirator A", an area landfill owner.[1]

---

[1]In the 10-page Factual Basis signed by Mouton, his counsel and the Government, Mouton stipulated to numerous facts that "set forth a sufficient factual basis for the crime to which [Mouton] is pleading guilty and that the government would prove the facts summarized therein beyond a reasonable doubt. One such fact described in the Factual Basis: that Mouton "received hundreds of thousands of dollars in illegal bribes from Co-conspirator A

In exchange for his guilty plea, his agreement to cooperate with respect to the Government's other targets, and his agreement to comply with the terms of the plea agreement, the Government agreed, among other things, to seek dismissal of the remaining seven counts, not to bring additional charges against him and his wife for federal tax violations, and to consider requesting that the Court impose a sentence below that contemplated by the sentencing guidelines.[2]

The circumstances of Mr. Mouton's guilty plea are undisputed. During the June 1 extensive rearraignment proceeding, Mr. Mouton was placed under oath. The Court confirmed that Mr. Mouton was able to understand the hearing and its consequences. After summarizing the indictment,[3] the Court carefully explained to Mr.

_____

during his appointment as a Commissioner on the [Louisiana Department of Wildlife and Fisheries]", and that he "received hundreds of thousands of dollars in illegal bribes from Co-conspirator A in return for these official acts [advocating for the closure of the Old Gentilly Landfill] as a Commissioner on the LDWF."

[2]The plea agreement provides that the Government retains sole discretion as to whether it will file a motion to reduce Mouton's sentence under either U.S.S.G. § 5K1.1 or Rule 35 of the Federal Rules of Criminal Procedure.

[3]Mr. Mouton, through counsel waived a reading of the indictment. The Court summarized the overt acts in connection with the charged conspiracy, noting that "[t]he government charges 209 overt acts...resulting in the acceptance of bribes by you [Mr. Mouton]" including:

    You accepted approximately 170 checks for bribes
    ranging from $513 to $30,000, each check being an overt
    act.  You wrote some 18 letters to the United States

3

Mouton the maximum sentence that the Court could impose, the waiver of appeal rights contained in the plea agreement, and the elements of conspiracy that the Government would be required to prove guilt beyond a reasonable doubt.  The Court explained to Mr. Mouton that he was entitled to a jury trial, could be convicted only by a unanimous jury, would be presumed innocent until proven guilty beyond a reasonable doubt, had no obligation to present evidence of his innocence at trial, and would have the opportunity to cross-examine government witnesses and call witnesses on his behalf.  Mr. Mouton specifically acknowledged that he understood each of these rights and that he was voluntarily giving up these fair trial rights by pleading guilty.  Counsel for Mr. Mouton acknowledged that she agreed with his decision to plead guilty and stated that she believed he did so knowingly, voluntarily, and with a full understanding of the consequences of pleading guilty.

During the plea colloquy, Mr. Mouton, under oath, confirmed that he was pleading guilty because he was guilty, and that his guilty plea was knowing and voluntary:

> THE COURT: Now, Mr. Mouton, having gotten this far in the proceeding here today, are you pleading guilty because you are, in fact, guilty of the crime charged?

---

Attorney for the Western District of Louisiana, to 17 United States senators, to the EPA, to the FBI, to the Corps of Engineers, some of which recommended phoney investigations, in order to wrongfully influence the keeping of the Old Gentilly Landfill closed in order to benefit you and your co-conspirators....

THE DEFENDANT: I am, Your Honor.

THE COURT: . . . . Have you been influenced, induced, or persuaded in any manner to plead guilty because of any promises of leniency or other things made by anyone?

THE DEFENDANT: No, Your Honor.

THE COURT: Have you been influenced, induced, or persuaded in any manner to plead guilty because of any threats made by anyone?

THE DEFENDANT: No, Your Honor.

THE COURT: Other than what we have discussed here in court today, has anyone, including your attorney, told you what sentence you might receive if I accept your plea of guilty?

THE DEFENDANT: No, Your Honor.

THE COURT: Have you had enough time to discuss this case with your attorney and to investigate with her any possible defenses that you might have?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you entirely satisfied with her advice and services?

THE DEFENDANT: I am, Your Honor.

***

THE COURT: Before we move on, let me ask you: Is there anything about the government's factual basis that is untrue or mistaken?

THE DEFENDANT: No. It's correct.

THE COURT: Let me ask you again, sir: Do you fully understand the charge against you?

THE DEFENDANT: I do, Your Honor.

THE COURT: Do you understand what it means to be saying that you are guilty as charged?

THE DEFENDANT: I do.

THE COURT: Are you pleading guilty because you are, in fact, guilty as charged?

THE DEFENDANT: I am guilty.

THE COURT: Now, you have said throughout that you wish to plead guilty, but I want you to understand: You have a right to plead not guilty. You have a right to go to trial. You would be entitled to those fundamental constitutional guarantees that I explained to you earlier. Do you understand that?

THE DEFENDANT: I understand that, Your Honor.

THE COURT: Do you still wish to plead guilty?

THE DEFENDANT: I do.

THE COURT: Are you doing so voluntarily and of your own free will?

THE DEFENDANT: I'm doing it voluntarily.

The Court found that there was a factual basis that supported Mouton's guilty plea and adjudged him guilty of conspiring to commit federal programs bribery, as charged in Count 1 of the indictment.

Mouton's sentencing hearing was initially scheduled for January 25, 2012. But the hearing has been postponed twice, after this Court granted joint motions to continue based on Mr. Mouton's continuing cooperation, and to permit counsel additional time to review the Pre-sentence Investigation Report. Sentencing is currently scheduled for June 19, 2013. The case and its prior history has taken a bizarre turn of events.

The Government has since abandoned charges it had filed

against other River Birch-related targets, as well as its investigation into River Birch and its principals (including "Co-conspirator A" referenced in Mouton's indictment) amid an online blogging scandal in the local U.S. Attorney's Office (that was publicly exposed by River Birch owner, Fred Heebe), and that resulted in the resignation of two senior Assistant U.S. Attorneys involved in the River Birch investigation.  Here follows a summary as to how this appalling story unfolded:

On March 12, 2012, River Birch landfill co-owner Fred Heebe filed a civil defamation lawsuit against a frequent commenter on NOLA.com (affiliated with the Times Picayune newspaper), alleging that the commenter was in fact Assistant U.S. Attorney Sal Perricone, one of the government prosecutors leading the River Birch investigation.  On March 15, 2012, then U.S. Attorney Jim Letten announced that Perricone had admitted he posted publicly as "HenryL.Mencken1951" and later it was revealed he posted under other online handles; Perricone resigned.  The U.S. Department of Justice's Office of Professional Responsibility is investigating that misconduct.

The Public Integrity Section of the Department of Justice has since replaced the local U.S. Attorney's office, which recused itself from the River Birch-related investigations amid the scandal, even before the full extent of the story had been revealed.

7

Then another local federal prosecutor's penchant for online commenting was similarly exposed.  On November 2, 2012 Heebe filed another defamation lawsuit in state court, naming another Assistant U.S. Attorney charged with leading the River Birch investigation: First Assistant U.S. Attorney Jan Mann; he alleged that Mann, like Perricone, had posted inappropriate comments on NOLA.com under a surreptitious handle, "eweman", including at least one post related to the River Birch investigation.  After Mann too admitted to posting online comments, she was demoted; eventually, she retired.[4] And, as a result of the revelations that Mann, too, had participated in inappropriate online commenting, including about the federal investigation, another Section of this Court recommended an inquiry into prosecutorial misconduct that is independent of the Office of Professional Responsibility's investigation; the Department of Justice specially appointed John Horn to conduct this separate inquiry.

On March 11, 2013 the Government abruptly publicly aborted its River Birch investigation by dismissing the indictment and superseding indictments against other indicted targets, Dominick Fazzio (River Birch's CEO) and Mark Titus (Fazzio's brother-in-law); at the same time, the Government also informed Mr. Heebe that it would not be pursuing any charges.  In its unopposed motion to

---

[4]In early December, U.S. Attorney Jim Letten resigned as the local U.S. Attorney.

8

dismiss the charges against Fazzio and Titus, the Government based its dismissal request on "evidentiary concerns" and "the interests of justice".  The Government obligingly stated that no criminal charges have been or will be asserted against River Birch or its principals.[5]

Notwithstanding the Government's abandonment of its investigation in the River Birch probe, Mr. Mouton has already entered a guilty plea and, thus, stands convicted of conspiracy to receive illegal bribes from "Co-conspirator A", the unnamed landfill owner.  Mouton now seeks to continue his sentencing hearing, and requests that this Court issue an order compelling the Government to produce a broad range of materials that "may lead to materials favorable to [Mr. Mouton]", including materials related to ongoing investigations of prosecutorial misconduct in the local U.S. Attorney's office and, it is speculated, investigations into the FBI agents involved in the River Birch investigation; law enforcement reports related to the investigation into Mr. Mouton; and materials related to the seizure of a pen-style microphone recorder that government agents confiscated from Mark Titus during

---

[5]Another River Birch-related defendant, Hendrikus Ton, was sentenced recently on May 30, 2013 to three years' probation, following his October 24, 2012 rearraignment, in which he pled guilty to conspiring with Dominick Fazzio to commit payroll fraud by concealing from the IRS salaries he paid to employees of his three companies to reduce the amount of employment tax owed.  Ton has not raised the issues presented here, and the facts of that case differ materially.  Ton was apparently the animating force in the payroll fraud events.

an interview two nights after Mr. Mouton pled guilty.   This discovery motion infers one unprecedented question:   assuming prosecutorial misconduct, does such conduct invalidate Mouton's candid and deliberate guilty plea as a matter of law?  The case literature offers no easy guide.

I.
A.

Mouton seeks a continuance of his sentencing hearing and an order compelling production of "all materials that are favorable to the defense or [that] may lead to materials favorable to the defense" including:

A.   All materials and findings related to the investigation of Salvadore Perricone and any other AUSAs involved in the River Birch investigation by the Justice Department's Office of Professional Responsibility ("OPR");

B.   All materials related to the filings by Jan Mann, related to [United States District Judge] Engelhardt's order to disclose public postings by, or similar to, those made by Perricone. *See United States v. Bowen, et al.*, 2:10-cr-00204-KDE-SS (E.D.La.), Doc. No. 1070, at 7 [Filed 11/26/12]("The government's June 27, 2012 'Report of Inquiry' was supervised, compiled, written and submitted by First AUSA Jan Mann.");

C.   All materials and findings related to the investigation and report ordered by [Judge] Engelhardt, and assigned to special prosecutor John A. Horn, after the public disclosure that Jan Mann had herself engaged in improper public discussions similar to Perricone and had misrepresented the truth in argument to the court;

D.   All materials and findings related to the seizure, examination, and return of a pen-style microphone recorder, possessed by former defendant Titus at the late-evening/night

meeting of June 3, 2012, at the USAO-EDLa;

E.   Catalogues of electronic communications by Perricone, produced by Jan Mann (July 13 and 20, 2012);

F.   Any and all documents related to other AUSAs using the internet and/or revealing information about the investigation of River Birch;

G.   All documents, pleadings, memos, and/or affidavits, including all search warrants, affidavits in support of search warrants, and FBI Form-302s or other investigative reports, in which Mr. Mouton or the payments to Mr. Mouton are mentioned;

H.   All drafts, metadata or other documents which reflect prior incarnations of the Form 302 prepared and submitted following the "late night meeting" on June 3, 2011;

I.   All copies of the altered sign-in sheet dated June 3, 2011 and a true copy of the original sign-in sheet and/or documents reflecting that the original sign-in sheet has been destroyed and by whom; and

J.   All materials and findings related to any investigation by the Office of the Inspector General of the United States (OIG) related to the conduct of the FBI office in the Eastern District of Louisiana related to the River Birch investigation and collateral investigations spawned therefrom.

Notably, Mr. Mouton does not seek to withdraw his guilty plea at this time. Rather, he seeks to discover exculpatory materials to verify that the plea was fairly negotiated, and not obtained in violation of his constitutional rights; he also seeks "to determine whether ... prosecutorial misconduct fatally wounded his guilty plea by ignoring the required fairness in securing agreement between an accused and a prosecutor." The Government opposes his request for discovery, focusing on the plea colloquy and the unequivocal nature of Mr. Mouton's guilty plea. In urging the

11

Court to deny Mouton's request, the Government contends that the discovery he seeks does not impact the factual or legal validity of his knowing and voluntary guilty plea and suggests that Mr. Mouton fails to submit any authority entitling him to the discovery he seeks.   In his reply papers, Mr. Mouton submits that: (1) prosecutorial deceit in the discovery and plea negotiation process would prevent a knowing and voluntary plea; (2) there is a potential jurisdictional defect; and (3) the Supreme Court has allowed for the possibility that a guilty plea does not waive all <u>Brady</u> violations.   Mr. Mouton invokes the eccentric facts of his case in support of his request.

*B.*

Mindful that Mr. Mouton does not presently challenge his conviction, the Court must consider his request for discovery in the context of his guilty plea.   The U.S. Supreme Court has cautiously left some uncertainty in plea cases:

> [T]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court.  Even then the truth will be in dispute.  In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the [Government's] case.  Counsel must predict how the facts, as [s]he understands them, would be viewed by a court. If proved, would those facts convince a judge or jury of the defendant's guilt?... Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be.  Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the

facts or as to what a court's judgment might be on given facts....

McMann v. Richardson, 397 U.S. 759, 770 (1970)(citing Brady v. United States, 397 U.S. 742, 756-57 (1970)).

The Court considers the threshold question of its jurisdiction first and then moves to the additional arguments.

1.  Jurisdictional Defect?

Mr. Mouton speculates that the discovery he seeks might demonstrate that a jurisdictional defect exists.  In particular, he suggests that the discovery he seeks would verify whether this Court lacked subject matter jurisdiction due to "a lack of actual crime."  It presents a rather metaphysical issue:  if the Government, post-plea, admits to evidentiary concerns, can Mouton be guilty even in the face of his admissions of guilt?  The Court is doubtful, but the alarming constitutional due process issue counsels caution.

"It is well-settled that '[w]hen a defendant enters a voluntary and unconditional guilty plea, the plea has the effect of waiving all non-jurisdictional defects in the prior proceedings.'" United States v. Daughenbaugh, 549 F.3d 1010, 1012 (5th Cir. 2008)(quoting United States v. Stevens, 487 F.3d 232, 238 (5th Cir.), cert. denied, 552 U.S. 936, 128 S.Ct. 336, 169 L.ED.2d 236 (2007)).

The Fifth Circuit has recently observed:

Subject matter jurisdiction, or the "court's power to

13

hear a case," is straightforward in the criminal context. Title 18 U.S.C. § 3231 grants "original jurisdiction ... of all offenses against the laws of the United States" to the district courts.  To invoke that grant of subject matter jurisdiction, an "'indictment need only charge a defendant with an offense against the United States in language similar to that used by the relevant statute.'" That is the extent of the jurisdictional analysis: "**[A] federal criminal case is within the subject matter jurisdiction of the district court if the indictment charges ... that the defendant committed a crime described in Title 18 or in one of the other statutes defining federal crimes.**"

<u>United States v. Scruggs</u>, 714 F.3d 258, 262 (5th Cir. 2013)(internal footnotes and citations omitted)(emphasis added).[6]

Mr. Mouton's suggestion that discovery might uncover a jurisdictional defect is premature and possibly even misplaced at best.  Mr. Mouton contends that this Court lacks jurisdiction over innocent conduct, and Mouton's mere "belief" that his conduct was criminal is not relevant to the jurisdictional inquiry.  The Government awkwardly ended its investigation into other River Birch targets, named or unnamed, due to "evidentiary concerns".  If there is no evidence that "Co-conspirator A" bribed Mr. Mouton, he urges, then there is insufficient evidence to prove that he participated in a conspiracy to receive illegal bribes, his admissions aside; discovery, Mouton urges, would verify whether a jurisdiction defect (a lack of actual crime) exists.  The Court disagrees with the

---

[6]In <u>Scruggs</u>, the Fifth Circuit noted that "[a]n indictment or information could fail to invoke criminal subject matter jurisdiction by alleging violation of a state criminal statute..., or by failing to comply with another statutory jurisdictional requireemnt...."  <u>Id.</u> n.14 (citations omitted).

jurisdictional point.   Determining whether federal criminal jurisdiction is invoked does not hinge on evidence.   Only <u>charged</u> conduct.

Mouton "'confuses a failure of fact with want of power to adjudicate' and [that] does not [doctrinally] implicate subject matter jurisdiction."   <u>See</u> <u>Scruggs</u>, 714 F.3d at 262 (citation omitted).[7]   To determine whether a district court had subject matter jurisdiction in a criminal case, the Court simply examines the indictment, not the sufficiency of the evidence.   <u>See</u> <u>United States v. Scruggs</u>, 691 F.3d 660, 667-68 (5th Cir. 2012)(as corrected

_____

[7]In <u>Scruggs</u>, the defendant pleaded guilty to a superseding information charging him with aiding and abetting honest-services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346.   <u>Id.</u> at 261.   Sometime after he was sentenced, the Supreme Court addressed the constitutionality of the honest-services statute and, to avoid problems of constitutional vagueness, limited the application of the statute to bribery and kickback schemes only. <u>Skilling v. United States</u>, --- U.S. ---, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010).   Scruggs then moved to vacate his sentence pursuant to 28 U.S.C. § 2255.   <u>Scruggs</u>, 714 F.3d at 261.   He argued that, in light of <u>Skilling</u>'s requirement that honest-services fraud involve proof of a bribe or kickback, his information did not use the word "bribe", and he did not admit to bribing a judge; therefore, he insisted, the district court had no jurisdiction of the "non-offense" and could not accept his guilty plea.   <u>Id.</u> at 261-62. The Fifth Circuit rejected his argument because "[e]ven though <u>Skilling</u> might have 'rendered the instant information *factually* insufficient, it did not divest the district court of subject matter jurisdiction over the case.'" <u>Id.</u> at 263 (emphasis in original)("All that Scruggs can really say is that, as a factual matter, the allegations of the information no longer suffice to allege honest-services fraud in light of <u>Skilling</u>.   This is simply not a jurisdictional argument....").   But <u>Scruggs</u> gives this Court barely a hint regarding the ultimate issue presented by Mouton's discovery request.

Aug. 17, 2013)(citing <u>United States v. Jackson</u>, 313 F.3d 231, 233 (5th Cir. 2002)).  As long as a violation of federal law is charged, the Court has jurisdiction "regardless of the sufficiency of the Government's proof."  <u>See</u> <u>Jackson</u>, 313 F.3d at 233.

The parties do not dispute that the indictment charged Mr. Mouton with an offense against the United States in language similar to that used by the relevant statute (here, conspiracy, 18 U.S.C. § 371).[8]  Accordingly, the indictment was sufficient to confer subject matter jurisdiction.  Given that there is no potential for exposing a jurisdictional defect, this asserted ground cannot serve as a basis for granting the broad discovery Mr. Mouton seeks.

2.  Prosecutorial Misconduct -- Involuntary Plea?

"A plea of guilty admits all the elements of a formal criminal charge and waives all non-jurisdictional defects in the proceeding leading to conviction."  <u>United States v. Cothran</u>, 302 F.3d 279, 285-86 (5th Cir. 2002)(quoting <u>United States v. Smallwood</u>, 920 F.2d 1231, 1240 (5th Cir. 1991)).  Significantly, "[t]he plea waives claims of governmental misconduct during the investigation and

---

[8]Even if Mr. Mouton is attempting to suggest that the indictment is somehow defective, his argument must fail.  In <u>United States v. Cotton</u>, the Supreme Court held that "defects in an indictment do not deprive a court of its power to adjudicate a case.... [T]he objection that the indictment does not charge a crime against the United States goes only to the merits of the case."  535 U.S. 625, 630 (2002).  In short, standard waiver principles apply to defects in an indictment.  <u>See</u> <u>United States v. Cothran</u>, 302 F.3d 279, 283 (5th Cir. 2002).

improper motives for prosecution." <u>Id.</u> at 286 (citing <u>United States v. Owens</u>, 996 F.2d 59, 60 (5th Cir. 1993)).[9]  Even more pertinently perhaps:  "When a defendant pleads guilty he or she, of course, forgoes not only a fair trial, but also other accompanying constitutional guarantees." <u>United States v. Ruiz</u>, 536 U.S. 622, 628 (2002)(citing <u>Boykin v. Alabama</u>, 395 U.S. 238, 243 (1969)). These accompanying constitutional guarantees waived by a defendant who pleads guilty include the right to assert a <u>Brady</u> violation and the right to pre-plea disclosure of impeachment information.  This is because such information "is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." <u>Id.</u>

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process.  When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.  He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*....

<u>Tollett v. Henderson</u>, 411 U.S. 258, 266 (1973).

---

[9]Among the non-jurisdictional defects waived by the defendant in <u>Owen</u>: (1) he waived the argument that the search and seizure conducted by the state law enforcement officials violated the Texas constitution; (2) he waived the claim that he was being prosecuted in federal court solely to enhance his punishment; (3) he waived the argument that the federal prosecutor chose to prosecute him because of his race.  996 F.2d at 60.  Because none of these arguments challenged the court's jurisdiction and all of the defects occurred prior to the defendant's guilty plea, the defects were waived.  <u>Id.</u>

> Of course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser the decision will likely be.  But the Constitution does not require the prosecutor to share all useful information with the defendant.

*Ruiz*, 536 U.S. at 628 (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)).  "There is no general constitutional right to discover in a criminal case, and *Brady* did not create one."  *Weatherford*, 429 U.S. at 559.  Indeed, in the context of rejecting the Ninth Circuit's holding that a guilty plea is not voluntary unless the prosecutors made the same disclosure of material impeachment information that the prosecutors would have had to make had the defendant insisted upon a trial, the Supreme Court instructed:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

*Ruiz*, 536 U.S. at 630 (citing *Brady*, in which the defendant "misapprehended the quality of the State's case"; other citations omitted).[10]

These principles apply generally in all plea cases but fall short of an overarching issue in Mouton's case:  if there was

---

[10]Mouton suggests that, perhaps, his plea was involuntary due to an alleged *Brady* violation.  The Court rejects this argument.  Mouton's argument is foreclosed by Fifth Circuit precedent holding that "a guilty plea precludes the defendant from asserting a *Brady* violation."  *United States v. Conroy*, 567 F.3d 174, 178 (5th Cir. 2009).

18

prosecutorial misconduct as to him, was his guilty plea structurally, constitutionally, tainted?

In place of the constitutional guarantees that accompany a criminal defendant's right to a fair trial, a defendant that pleads guilty must enter a plea that is "voluntary" and the Court must confirm that the defendant waives his right to a fair trial (and related waivers) "knowing[ly], intelligent[ly], [and] with sufficient awareness of the relevant circumstances and likely consequences." Ruiz, 536 U.S. at 628. (quotation omitted). Ruiz seems rather equivocal, however:

> And the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances–even though the defendant may not know the specific detailed consequences of invoking it. A defendant, for example, may waive his right to remain silent, his right to a jury trial, or his right to counsel even if the defendant does not know the specific questions the authorities intend to ask, who will likely serve on the jury, or the particular lawyer the State might otherwise provide.... [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor. See *Brady v. United States*, 397 U.S. at 757, 90 S.Ct. 1463 (defendant "misapprehended the quality of the State's case")....

Id. at 630.

Thus, in general, "[t]he longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of

action open to the defendant.'"   Hill v. Lockhart, 474 U.S. 52, 57 (1985).

Mr. Mouton does not yet challenge the fairness and adequacy of the procedures utilized by this Court in accepting his guilty plea.[11]  Whether he can ultimately do so cannot yet be decided. Some limited discovery might possibly be a prudent course for the Court to consider, if the structural issue that challenges this case has substance.   It is beyond dispute that the Court, in accordance with Federal Rule of Criminal Procedure 11, determined that Mr. Mouton pled guilty voluntarily with an understanding as to the nature of the charges against him; that the Court addressed Mr. Mouton in the course of making the determination as to the voluntariness of the plea; and that the Court determined that there was a factual basis for the guilty plea.   "Reviewing courts give great weight to the defendant's statements at the plea colloquy." United States v. Cothran, 302 F.3d 279, 283 (5th Cir. 2002).

The Government focuses on Mouton's unequivocal admission of guilt during the Rule 11 colloquy at his rearraignment and suggests that the discovery he seeks does not impact either the factual or

---

[11]Mr. Mouton unequivocally swore under oath "I am guilty." This Court satisfied itself then, and has been given no reason to question now, that Mr. Mouton, a competent defendant, entered his plea of guilty voluntarily and intelligently with adequate advice of counsel.  Nothing has been brought to this Court's attention that would cause it to question the accuracy and reliability of the defendant's admission that he conspired with another to accept illegal bribes.

legal validity of his knowing and voluntary guilty plea.   Mouton counters that "[t]oday, it appears that the Government's position is that Mouton was bribed by and/or conspired with---NOBODY" and that, without these materials, counsel cannot provide Mouton with his Sixth Amendment right to effective counsel and cannot ensure that he has received Due Process under the Fifth Amendment.   It is the due process issue that is worrisome.   But neither side serves up an adequate remedy that is guided by the case literature.

3.   Effective Assistance of Counsel and Fair Process?

Finally, and perhaps in the hope to distract with an always popular issue, counsel for Mouton contends that she cannot be certain that she rendered effective assistance without having the benefit of the discovery materials regarding prosecutorial misconduct.   An inquiry into effective assistance of counsel at this stage is advisory at best.   "That a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing."  McMann v. Richardson, 397 U.S. 759, 770 (1970).

II.

The Court finally considers whether the strange facts of this case warrant departure from the case literature that does not speak to the flagrant government misconduct that the defendant contends may have tainted the proceedings against him and undermined the

21

validity of his plea of guilty.  Perhaps a more direct, and as yet inadequately briefed issue is the structural constitutional due process issue:  is Mouton's guilty plea constitutionally tainted by the facts presented?  If so, some limited discovery will be appropriate.

The Court notes, however, that Mouton's request for broad categories of discovery suffers from the additional problems that, as the Government points out, many of the materials Mouton requests would not be discoverable under Brady or Rule 16 of the Federal Rules of Criminal Procedure, even if Mouton had proceeded to trial. But that brings the Court to the unique circumstances of this case, and whether, if Mouton were to invoke the "interests of justice" as grounds for discovery, it might then be warranted.

The Court should note that on January 23, 2013 Judge Hayden Head considered and rejected a post-plea request for an evidentiary hearing into prosecutorial misconduct. United States v. Broussard, No. 11-299 (E.D. La.).  After Broussard had pleaded guilty but before he was sentenced, he requested an evidentiary hearing to examine, among other things, admissions related to Perricone and Mann "and their affinity for blogging their opinions on alleged criminal activities of certain members of the New Orleans community, including those of Defendant Broussard."  Broussard did not seek to dismiss the indictment or to withdraw his pleas of guilty.  His more narrow request seems not to have targeted the

22

constitutional issue here.  Judge Head denied Broussard's request, determining that Broussard waived all non-jurisdictional defects (including claims of government misconduct).  "With no timely motion to withdraw his pleas of guilty," Judge Head wrote, "holding an evidentiary hearing affords little gain when balanced against the appropriate conclusion of this criminal litigation – the sentencing of a defendant who by his own sworn public admissions is guilty of the crimes charged and has been found so."  The Court duly notes Judge Head's admonition.

Accordingly, the Court orders additional briefing within one week on the following issue:

> Assuming prosecutorial misconduct, does such conduct structurally invalidate Mouton's guilty plea as a matter of due process constitutional law?

The defendant's motion is hereby GRANTED in part and DENIED in part, without prejudice, as follows:  the issue of discovery is taken under submission and Mouton's sentencing date is hereby continued, to be reset upon notice by this Court.

New Orleans, Louisiana, June 5, 2013.

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

23